Eastern District of Kentucky
**FILED**
JUL 06 2020
AT LONDON
ROBERT R. CARR
CLERK U.S. DISTRICT COURT

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
SOUTHERN DIVISION
LONDON

CRIMINAL ACTION NO. 6:20-cr-38-REW

| | |
|---|---|
| UNITED STATES OF AMERICA | PLAINTIFF |
| V. | **PLEA AGREEMENT** |
| DAVID B. GUSTIN | DEFENDANT |

\* \* \* \* \*

1. Pursuant to Federal Rule of Criminal Procedure 11(c), the Defendant will enter a guilty plea to the single count of the Information, charging a violation of 21 U.S.C. §§ 842(a)(5) A, 3B and (c)(2)(B) K (D-J), knowingly failing to file suspicious order reports. Pursuant to Rule 11(c)(1)(A), the United States will move at sentencing to dismiss the Indictment in *United States v. David B. Gustin*, Criminal No. 6:19-CR-14-REW.

2. The essential elements of the Information's single count are:

    (a) the Defendant failed to make, keep, or furnish a record, report, notification, declaration, order or order form, statement, invoice, or information required by the Controlled Substances Act and its implementing regulations; and

    (b) the Defendant did so knowingly.

3. As to the count charged in the Information, the United States could prove the following facts that establish the essential elements of the offense beyond a reasonable doubt, and the Defendant admits these facts:

(a) The Defendant, David B. Gustin, worked for McKesson Corporation ("McKesson"), starting with inventory management at a distribution center in Washington Court House, Ohio. McKesson is among the largest distributors of controlled substances registered with the Drug Enforcement Administration ("DEA"). In 2008, following the DEA's issuance of multiple Orders to Show Cause, McKesson signed a settlement agreement with the United States Department of Justice and a related Memorandum of Agreement with the DEA resolving the government's allegations that McKesson failed to report as suspicious orders the sales of millions of dosage units of hydrocodone, as well as oxycodone and other controlled substances, as required by and in violation of 21 C.F.R. § 1301.74(b) and 21 U.S.C. § 842(a)(5). In addition to paying $13.25 million, McKesson agreed to maintain a compliance program designed to detect and prevent diversion of controlled substances as required under the Controlled Substances Act ("CSA"), which would include review of customer orders of controlled substances that exceed established thresholds and criteria by a McKesson employee trained to detect suspicious orders. McKesson subsequently implemented a Controlled Substance Monitoring Program ("CSMP").

(b) McKesson promoted the Defendant to the position of Director of Regulatory Affairs ("DRA") for its "North Central" region that spanned 15 states, including Kentucky. As DRA, the Defendant was responsible for identifying suspicious orders of controlled substances in his region, approving new customers to order controlled substances, and setting the monthly volume limits for such orders. The Defendant knew about McKesson's 2008 settlement with DEA, the company's obligations as a DEA-registered distributor to maintain adequate controls against the diversion of controlled substances and its obligations to detect and report suspicious orders. McKesson's CSMP specifically instructed to "[r]efrain from using the word 'suspicious' in communications. Once McKesson deems an order and/or customer suspicious, McKesson is required to act. This means all controlled substances sales to that customer must cease and the DEA must be notified." The Defendant understood McKesson's policy to be to report suspicious orders to DEA after they deemed a customer suspicious and terminated access to controlled substances. However, the relevant regulation, 21 C.F.R. § 1301.74, requires the registrant to inform DEA "of suspicious orders when discovered by the registrant," and it nowhere refers to "suspicious customers" or predicates the requirement to report suspicious orders on first deeming a customer suspicious. DEA regulatory guidance sent to drug manufacturers and drug distributors like McKesson, as well as DEA administrative orders such as the 2007 order in the matter of Southwood Pharmaceuticals, Inc., emphasized the requirement to timely report suspicious orders when discovered and that the discovery of suspicious orders triggered an obligation to determine, prior to completing the sale, whether the drugs ordered were likely to be diverted from

2

legitimate channels. The Defendant also knew that oxycodone and hydrocodone, among other drugs, were controlled substances.

(c) On July 27, 2011, the Defendant met with DEA agents following an inspection at the Washington Courthouse Distribution Center. One of the topics of discussion was McKesson's obligation to report suspicious orders not just suspicious customers. DEA advised the Defendant that federal regulation required him to report orders of unusual size, orders deviating substantially from a normal pattern, and orders of unusual frequency to DEA as suspicious.

(d) In June 2011, an owner of two pharmacies – Community Drug of Manchester and Medi Center Drug – switched from a competitor to become a McKesson customer and was approved to receive controlled substances by the Defendant. Both pharmacies operated in Manchester, Kentucky, in the Eastern District of Kentucky. In a "pharmacy questionnaire" the pharmacy owner and a McKesson sales representative completed and submitted to the Defendant pursuant to McKesson's CSMP, Community Drug estimated dispensing 5,000 dosage units of oxycodone per month. In the pharmacy's first full month of ordering (July 2011), McKesson shipped 21,900 dosage units of oxycodone. The Defendant knew that Community Drug was ordering substantially more oxycodone than the 5,000 dosage units disclosed on the pharmacy questionnaire because the pharmacy could not receive the higher quantity without the Defendant raising the limits (called "thresholds") McKesson placed on Community Drug's oxycodone orders. Community Drug received even more oxycodone from McKesson in subsequent months: 36,100 dosage units in August 2011; 47,500 dosage units in September 2011; 48,200 dosage units in October 2011; 37,300 dosage units in November 2011; and between 25,500 to 31,100 dosage units per month from December 2011 to April 2012. The Defendant raised Community Drug's oxycodone thresholds multiple times to allow for these increased sales.

(e) The Defendant also knew that Community Drug was ordering an unusual and suspiciously high volume of oxycodone 30mg, both in real terms and as a proportion of the pharmacy's overall oxycodone ordering. McKesson shipped Community Drug 27,900 dosage units of oxycodone 30mg in September 2011, which was more than 58% of the pharmacy's total oxycodone orders for that month. The Defendant knew that oxycodone 30mg had particularly high demand and value in the illicit market and that a pharmacy ordering a disproportionate volume of oxycodone 30mg versus other strengths, was a suspicious ordering pattern and a red flag of diversion. After McKesson implemented a subset threshold for oxycodone 30mg in November 2011, the Defendant set this subset threshold for Community Drug at a high ratio to the pharmacy's overall oxycodone threshold. The Defendant also received dispensing data from Community Drug that further demonstrated the

suspicious nature of these oxycodone 30mg orders. For example, Community Drug sent dispensing data on November 3, 2011 in conjunction with a request to increase its oxycodone threshold by 5,000 dosage units, and the Defendant approved the same day the dispensing data was sent. This data showed that from August 1, 2011 to October 31, 2011, Community Drug dispensed 73,062 oxycodone 30mg dosage units in 478 prescriptions, for an average of 152.8 doses per prescription.

(f) After hearing of an investigation by the Kentucky Board of Pharmacy into Community Drug, the Defendant reported in a May 1, 2012 letter to DEA that McKesson had ceased selling all controlled substances to Community Drug as of that same date. He sent another letter to DEA on May 21, 2012 that McKesson had "conducted additional review" and resumed sales on May 18, 2012. This subsequent letter did not disclose to DEA that Community Drug had been filling high volumes of out-of-state prescriptions for oxycodone or that the Defendant's "additional review" did not find any legitimate justification for Community Drug's suspicious ordering.

(g) A letter from the Defendant to the owner of Community Drug dated May 17, 2012 represented that McKesson's resumption of sales to Community Drug was conditioned on Community Drug ceasing filling prescriptions for controlled substances from providers and patients "outside the immediate vicinity," from three named pain clinics, from any out-of-state doctors, and from three named doctors. Community Drug dispensing data provided to the Defendant in the subsequent months showed that drugs Community Drug was ordering from McKesson continued to be dispensed for prescriptions from outside the immediate vicinity, including out-of-state doctors, and from the pain clinics and a doctor named in the Defendant's May 17, 2012 letter. The Defendant did not report any of this ordering to DEA as suspicious. Community Drug's ordering increased after the Defendant approved a doubling of Community Drug's oxycodone and hydrocodone thresholds in August 2012. McKesson continued to ship orders to Community Drug after receiving a subpoena from DEA regarding Community Drug, after news media published stories about DEA's execution of a search warrant at Community Drug, and after a DEA agent interviewed the Defendant about Community Drug's controlled substances ordering.

(h) The Defendant knew that Community Drug placed oxycodone orders from July 2011 to April 2012 that were of unusual size and that deviated substantially from a normal pattern. He likewise had knowledge, at least through deliberate ignorance, that Community Drug continued ordering drugs after May 2012 to fill prescriptions it had purportedly agreed not to fill. He knew that federal law required reporting these orders to DEA as suspicious, but he did not do so.

4

4. The statutory punishment for the count charged in the Information is imprisonment for not more than one year, a fine of not more than $100,000, and a term of supervised release of not more than one year. A mandatory special assessment of $25 applies, and the Defendant will pay this assessment to the U.S. District Court Clerk at the time of the entry of the plea.

5. Pursuant to Rule 11(c)(1)(B), the United States and the Defendant recommend the following sentencing guidelines calculations, and they may object to or argue in favor of other calculations. This recommendation does not bind the Court.

>   (a) The latest version of the United States Sentencing Guidelines (U.S.S.G.) Manual that is in effect at the time of sentencing shall be used to determine the Defendant's guideline range.

>   (b) Pursuant to U.S.S.G. § 2D3.2, the base offense level is 4.

>   (c) Pursuant to U.S.S.G. § 3E1.1 and unless the Defendant commits another crime, obstructs justice, or violates a court order, decrease the offense level by 2 levels for the Defendant's acceptance of responsibility. If the offense level determined prior to this 2-level decrease is level 16 or greater, the United States will move at sentencing to decrease the offense level by 1 additional level based on the Defendant's timely notice of intent to plead guilty.

6. No agreement exists about the Defendant's criminal history category pursuant to U.S.S.G. Chapter 4.

7. The Defendant will not file a motion for a decrease in the offense level based on a mitigating role pursuant to U.S.S.G. § 3B1.2 or a departure motion pursuant to U.S.S.G. Chapter 5, Parts H or K.

8. The Defendant waives the right to appeal the guilty plea, conviction, and sentence, with the sole exception that if the sentence exceeds the sentencing guideline

5

range determined by the Court at the sentencing hearing, the Defendant retains the right to appeal the sentence. Except for claims of ineffective assistance of counsel, the Defendant also waives the right to attack collaterally the guilty plea, conviction and sentence.

9. The Defendant waives any defense or argument regarding the conduct charged in the Information and admitted in Paragraph 3 herein falling outside the statute of limitations. The Defendant has been advised of this potential affirmative defense, which he freely and knowingly waives.

10. The United States is not seeking restitution. The Defendant understands and agrees that, pursuant to 18 U.S.C. § 3613, whatever monetary penalties are imposed by the Court will be due and payable immediately and subject to immediate enforcement by the United States. If the Court imposes a schedule of payments, the Defendant agrees that it is merely a minimum schedule of payments and not the only method, nor a limitation on the methods, available to the United States to enforce the judgment. The Defendant waives any requirement for demand of payment on any fine or assessment imposed by the Court and agrees that any unpaid obligations will be submitted to the United States Treasury for offset. The Defendant authorizes the United States to obtain the Defendant's credit reports at any time. The Defendant authorizes the U.S. District Court to release funds posted as security for the Defendant's appearance bond in this case, if any, to be applied to satisfy the Defendant's financial obligations contained in the judgment of the Court.

11. If the Defendant violates any part of this Agreement, the United States may void this Agreement, proceed in the prosecution of the case in *United States v. David B.*

*Gustin*, Criminal No. 6:19-CR-14-REW, and seek an indictment for any other violations of federal laws, and the Defendant waives any right to challenge the initiation of additional federal charges.

12. This document and the supplement contain the complete and only Plea Agreement between the United States Attorney for the Eastern District of Kentucky and the Defendant. The United States has not made any other promises to the Defendant.

13. This Agreement does not bind the United States Attorney's Offices in other districts, or any other federal, state, or local prosecuting authorities.

14. The Defendant and the Defendant's attorney acknowledge that the Defendant understands this Agreement, that the Defendant's attorney has fully explained this Agreement to the Defendant, and that the Defendant's entry into this Agreement is voluntary.

Date: 6/24/2020       By:

ROBERT M. DUNCAN, JR.
UNITED STATES ATTORNEY

Robert M. Duncan, Jr.
United States Attorney

Date: 6-24-20

David B. Gustin
Defendant

Date: 6-24-20

Brian Butler
Attorney for Defendant

8