UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
AT LONDON

UNITED STATES OF AMERICA                                    PLAINTIFF

v.                                            CRIMINAL ACTION NO. 6:20-CR-38-REW

DAVID GUSTIN                                                 DEFENDANT

## SENTENCING MEMORANDUM
*ELECTRONICALLY FILED*

Comes the Defendant, David Gustin, by and through counsel, Brian Butler and Paul
Dzenitis, and hereby submits the following sentencing memorandum in support of a probated
sentence:

David Gustin ("Dave") pled guilty to the misdemeanor offense of failing to report
suspicious orders in 2011/2012 in connection with Community Drug Pharmacy in Manchester,
Kentucky.  The Presentence Investigation Report ("PSI") calculates Dave's guideline range at 0-6
months.  His guideline range is in Zone A which authorizes a sentence of probation pursuant to
United Sentencing Guideline § 5B1.1.  As such, we respectfully request the Court sentence Dave
to probation.

APPLICATION OF 18 U.S.C. § 3553(a)

Pursuant to 18 U.S.C. § 3553(a), the Court shall impose a sentence sufficient, but not
greater than necessary, to comply the delineated sentencing considerations.

A.    Nature and Circumstances of the Offense

    I.    Offense Conduct

        a.    Community Drug Pharmacy

Dave was an employee of wholesale pharmaceutical distributor McKesson Corporation ("McKesson") from 1995 to 2016.  After more than a decade working in inventory management, Dave joined McKesson's regulatory affairs department as Director of Regulatory Affairs ("DRA") for McKesson's North Central Region in 2008. Dave served as a DRA until early 2014. Upon leaving his position as a DRA, Dave continued to work for McKesson in a different capacity, unrelated to his role as a DRA, until his retirement in 2016.

As a DRA, Dave was responsible for administering McKesson's Controlled Substances Monitoring Program ("CSMP") for retail pharmacy customers located throughout 15 states including pharmacies located in the Eastern District of Kentucky.  He was responsible for monitoring 3000 to 4000 independent retail pharmacies as well as certain retail national pharmacy chain accounts.  All told, he had responsibility for well over 10,000 pharmacies. Dave's duties included setting and monitoring monthly controlled substance order limits, known as thresholds, for independent retail customers in his region and conducting pharmacy-specific due diligence reviews.  Dave was selected for the DRA position based upon his integrity and the needs of the company.  No portion of Dave's compensation was tied to the sale of controlled substances to pharmacies under his purview.

Dave had no role in designing the CSMP, which McKesson developed as part of a 2008 settlement agreement with DEA.  McKesson vetted its CSMP during multiple meetings with DEA headquarters and field divisions as part of the 2008 settlement agreement.  McKesson's

CSMP established a three level review process for pharmacy customers.  Pursuant to this review process, pharmacy customers were not reported as "suspicious" until McKesson's review was elevated to a Level 3 where the Senior Vice President of Distribution Operations (Dave's boss) made the final decision regarding whether McKesson would continue to supply the customer with controlled substances.  Upon completion of a Level 3 review, the Director of Regulatory Affairs was responsible for notifying DEA of a decision by McKesson to discontinue distributing controlled substances to a customer.  *Exhibit ("Exh") 1.*

McKesson's CSMP directed DRA's and others to "refrain from using the word 'suspicious' in communications" because once McKesson deemed an order and/or customer "suspicious" then they were required to cease sales and notify DEA.  *Exh. 2.*  As a practical matter, McKesson reported suspicious customers but not individual suspicious orders. [1]  *Exh. 3.*  Dave followed McKesson's policy and reported suspicious customers following a Level 3 review and a final determination by his superior to cease all sales of controlled substances.

In July 2011 as part of the inspection process at McKesson's Washington Courthouse Distribution Center, local DEA agents advised Dave that McKesson was obligated to report suspicious orders not just suspicious customers.  DEA's guidance at the local level was contrary to McKesson's policy – which was explained to representatives from DEA Headquarters and field divisions at multiple meetings in 2008 - of reporting suspicious orders once a customer was deemed suspicious.[2]

---

[1] The Congressional Opioid Report found that it was McKesson corporate policy to report suspicious customers not suspicious orders.  On or about January 17, 2017, McKesson paid the Department of Justice $150 million for failure

In June 2011, Community Drug Pharmacy switched sourcing pharmaceuticals from Smith Drug Company to McKesson.  As detailed further below, McKesson's supply relationship would last from June 2011 through October 2012, with McKesson twice making the determination to terminate Community Drug as a customer in May 2012 (reinstated a few weeks later) and again in October 2012.  Each time DEA was notified of the decision to terminate (and reinstate) Community Drug based upon a review conducted pursuant to McKesson's CSMP.

McKesson's order management system uses monthly thresholds to set limits on how many dosage units a pharmacy can order of a particular drug family (e.g., oxycodone products). When Community Drug switched to McKesson as its supplier, during the due diligence process to become a McKesson customer, it filled out a pharmacy questionnaire estimating that the pharmacy would dispense 5,000 oxycodone units per month.  Thresholds for individual pharmacy customers at the time were set by the DRAs based on information obtained from the pharmacy as part of the due diligence review when the customer was onboarded.  Dave's practice was to set thresholds based upon a review of dispensing data provided by the pharmacy.

In July 2011, Dave set Community Drug's initial oxycodone threshold at 8000 dosage units per month, which was the default threshold for retail pharmacies pursuant to McKesson's CSMP.  Based on Threshold Change Requests ("TCR") and dispensing data submitted by Community Drug, Dave increased the pharmacy's oxycodone thresholds multiple times in subsequent months.  July 2011 was Community Drug's first month ordering oxycodone from McKesson.  In an attempt to "right size" the pharmacy's thresholds (the default threshold was

---

to report suspicious orders throughout the United States from 2008 until 2013.
[2] McKesson changed their policy in 2013 and began reporting all orders exceeding a threshold as "suspicious."

typically used for new pharmacies without dispensing histories), Dave increased the oxycodone threshold twice from the default of 8,000 dosage units to 13,000 and then 23,000 dosage units, with the pharmacy receiving 21,900 dosage units of oxycodone for the month.  Subsequently, Community Drug's monthly oxycodone threshold was increased and the pharmacy received nearly 50,000 oxycodone dosage units in September and October.  From November 2011 through April 2012, Community Drug received oxycodone dosage units per month ranging from 25,500 to 37,300.  Although Community Drug's previous supplier, Smith Drug Company, was supplying the pharmacy with 30,000 to 40,000 oxycodone dosage units per month prior to Community Drug switching to McKesson, Dave acknowledges in retrospect that Community Drug's increase in ordering from 22,000 oxycodone dosage units in July 2011 to 47,500 units in October 2011 was suspicious based upon the size of the increase.

Based on the volume of controlled substances that Community Drug had purchased, including oxycodone 30 mg, Dave initiated an investigation of the pharmacy in April 2012.  On April 20, 2012, Dave visited Community Drug and uncovered potential "red flags" indicating that the pharmacy may not be operating as it should.  Dave noted that Community Drug was unaware if the pain clinics where some of the pharmacy's patients received prescriptions operated a cash only business or if any of the doctors for whom it was filling prescriptions had pending medical board actions.  Dave also noted that Community Drug filled prescriptions written by prescribers located in Georgia if the patient was a local resident. *Exh. 4.*

Following his visit, Dave continued his investigation of Community Drug.  He began investigating doctors for whom Community Drug had been filling prescriptions. *Exh. 5.*  He requested information concerning the percentage of oxycodone sales as an overall percentage of

prescription sales. *Exh. 6.* As part of his investigation, Dave contacted the Kentucky Board of Pharmacy. The Kentucky Board of Pharmacy confidentially advised Dave that they were investigating Community Drug and they recommended not selling any more than the default threshold amounts to the pharmacy, but stopped short of advising Dave that McKesson should cease selling controlled substances to the pharmacy. Dave expressed to others at McKesson that he was conflicted as to whether to drop Community Drug to standard amounts as recommended by the Kentucky Board of Pharmacy or terminate the pharmacy's ability to order controlled substances altogether. *Exh. 7.*

Per McKesson's policy, Dave elevated the decision concerning Community Drug's status to his superior, Don Walker. Together, they made the decision to terminate Community Drug's ability to order controlled substances. *Exh. 8.* On May 1, 2012, Dave notified DEA that McKesson had terminated Community Drug's ability to order controlled substances. *Exh. 9.*

Following the termination, Community Drug's owner Terry Tenhet lobbied McKesson to reinstate the pharmacy. Mr. Tenhet made assurances that Community Drug would end all questionable practices. *Exh. 10.* On May 16, 2012, Mr. Tenhet submitted a letter promising to utilize Kentucky's Prescription Drug Monitoring Program, KASPER, prior to filling prescriptions; refrain from filling prescriptions from out-of-state doctors or patients and refrain from filling prescriptions from certain named pain clinics. *Exh. 11.* On May 17, 2012, Dave sent Mr. Tenhet a letter detailing McKesson's expectations as to steps Community Drug must take to prevent diversion. Dave's letter further noted that it was his understanding that Mr. Tenhet "called both the local and regional DEA as well as the Ky. BOP in an effort to demonstrate a sense of urgency to be compliant." *Exh. 12.* Based upon Community Drug's assurances, Dave's

supervisor, Don Walker, reinstated Community Drug's ability to order controlled substances. *Exh. 13.* Dave notified DEA on May 21, 2012, that McKesson resumed selling Community Drug Pharmacy controlled substances. McKesson set Community Drug's controlled substances thresholds at the default level and upon reinstatement, Community Drug was only permitted to purchase 8000 dosage units of oxycodone per month.

Following Community Drug's reinstatement, Dave monitored the pharmacy more closely. No threshold increases were considered until July 2012 despite the fact that Community Drug's thresholds were substantially less than they were prior to the pharmacy's May 2012 termination. On July 23, 2012, a McKesson sales representative emailed Dave asking him to consider increasing Community Drug's thresholds. Dave solicited the opinion of other McKesson employees and concluded that he would permit marginal threshold increases if Community Drug was not servicing pain doctors, pain clinics or out-of-state doctors. Dave stated that Community Drug's ratio of oxycodone 30 mg purchases to all oxycodone purchases must remain at or below 25%. Dave further stated that he "would not be comfortable ever getting to 20K on oxy." *Exh. 14.*

On July 25, 2012, a Washington Court House distribution center employee notified Dave that there were a couple of concerns based upon a review of dispensing data provided by the pharmacy. Community Drug filled some prescriptions from out-of-state doctors. Dave inquired as to the percentage of prescriptions filled by out of state doctors and was informed it was not a large number (7 scripts). *Exh. 15.* Dave did not escalate the pharmacy to Level III and file a suspicious order report. In retrospect, Dave acknowledges that he should have filed a suspicious order report given the problems he uncovered in April. Nonetheless, Community Drug was not

granted a threshold increase in July 2012.

In late July 2012, Dave met Mr. Tenhet and his wife Melissa at a restaurant in London, Kentucky to discuss McKesson's compliance expectations including reminding them that they were not to fill prescriptions from out of state doctors.  On August 2, 2012, Ms. Tenhet emailed Dave advising him that the pharmacy had added another questionable doctor to its internal list of doctors for whom it would not fill prescriptions.  *Exh. 16.*  Dave took this as a sign that Community Drug was trying to conduct its business ethically and in conformance with its commitments to McKesson.

On August 15, 2012, Ms. Tenhet emailed Dave advising him that Community Drug's diligence against diversion was going well and indicated that she had a folder of diligence information prepared by the pharmacy.  *Exh. 17.*  Subsequently, a McKesson sales representative contacted Dave requesting a threshold increase for Community Drug based on its commitments, reminding Dave that Community Drug's significantly reduced thresholds had "crushed their business."  *Exh. 18.*

On August 23, 2012, Dave increased Community Drug's oxycodone and hydrocodone thresholds from 8000 dosage units per month to 16,000 dosage units per month.  Dave emailed the McKesson sales representative that he was "convinced they [Community Drug] are trying hard to do things the right way."  *Exh. 19.*  Dave also emailed Melissa Tenhet advising her that he had increased the pharmacy's thresholds.  In his email to Ms. Tenhet, Dave stated, "I appreciate the sense of urgency you are showing and encourage you to continue pressing your staff to be discerning to a fault when it comes to filling these scripts."  Ms. Tenhet responded by informing Dave that she had reported a physician to the Kentucky Board of Medical Licensure

for his improper prescribing practices.  *Exh. 20.*  According to DEA Special Agent Douglas

Dalrymple's affidavit in support of a search warrant for Community Drug in September 2012,

Mr. Tenhet showed his employee "how to enter information into the computer system to hide

prescriptions from the distributor [McKesson]."  *Exh. 21.*  Dave genuinely believed that

Community Drug was trying to honor its commitments and the Tenhets were committed to

deceiving McKesson.

   On September 9, 2012, DEA interviewed Dave about previous issues relating to

Community Drug.  DEA did not advise Dave that they suspected Community Drug was currently

involved in illegal conduct.  DEA did not recommend that McKesson terminate Community

Drug as a customer.

   DEA executed a search warrant at Community Drug on September 11, 2012.  On

September 19, 2012, Dave reduced Community Drug's oxycodone threshold by more than one-

half to a mere 6700 dosage units per month (less than the default amount).  On September 25,

2012, Dave was notified that McKesson's Washington Court House distribution center had

received a subpoena for records relating to Community Drug.  The Government subpoena

mandated nondisclosure as to the issuance of the subpoena.[3]  *Exh. 22.*  Subsequently, Dave

reduced Community Drug's hydrocodone threshold by one half to the default amount of 8000

dosage units per month.

   On October 18, 2012, Dave received a newspaper article concerning the basis of the DEA

investigation.  Dave learned that Community Drug's owners had been lying to him and were

---

[3] Former DEA Chief Kyle Wright testified, "We had problems with administrative subpoenas.  These people
[registrants] would cut the customers off because I sent an information request.  We specifically started telling them,

engaged in ongoing illegal activities.  Dave emailed a McKesson DRA for another region advising that McKesson had terminated Community Drug's ability to order controlled substances but had reinstated the pharmacy when McKesson received commitments from Community Drug to operate appropriately and since the reinstatement had not been receiving large quantities of controlled substances.  Most importantly, Dave advised that he was unaware of Community Drug's illegal activities.  *Exh. 24.*

The following day Dave made Community Drug ineligible to purchase controlled substances.  On October 23, 2012, Dave notified DEA that Community Drug's ability to order controlled substances had been terminated.

> b.   Family Discount

Dave was not charged with any allegations that he failed to file suspicious order reports in connection with Family Discount Pharmacy, located in Mt. Gay, West Virginia.  As discussed in more detail below, DEA never took any action to suspend or revoke Family Discount's DEA registration and terminate its ability to order controlled substances.  However, United States Probation addressed Family Discount in the PSI and, therefore, we will briefly address Family Discount.

Paragraph 34 of the PSI notes that Dave responded to an email in February 2009 that Family Discount, and other customers, had been previously terminated as McKesson customers. Family Discount was terminated prior to Dave becoming a DRA.  While Dave has no specific memory of this email from eleven (11) years ago, it is likely that he obtained this information from someone at Washington Court House.  Dave forwarded it to Don Walker in order for Mr.

---

"Don't do that."  Because it's not an inference that there's an investigation going on."  *Exh. 23.*

Walker to comply with a request for information from DEA headquarters.

In 2010, Family Discount submitted a customer application to McKesson.  Paragraph 35 of the PSI states that Dave brought Family Discount back as a customer without requiring a customer questionnaire.  This is simply incorrect.  Family Discount submitted a questionnaire on or about January 26, 2010.  In the questionnaire, Family Discount disclosed that they dispensed 155,000 hydrocodone dose units per month.  *Exh. 25.*

In the process of vetting Family Discount, Dave emailed other McKesson employees that he had done internet research about Family Discount and its pharmacists.  Dave's email stated that the only information was "good stories of community assistance, etc."  Dave further stated, "I cannot see any reason we should be hesitant even with the large numbers he is talking about (155K hydro …)"  *Exh. 26.*  Dave simply didn't recall that Family Discount had been previously terminated.

Dave's assessment was consistent with another distributor's evaluation of Family Discount.  On June 10, 2009, Harvey Florian, a diversion investigator for Cardinal Health, visited Family Discount.  Mr. Florian determined "that the pharmacy [Family Discount] does not represent a significant risk for diversion."  *Exh. 27.*  Additionally, Cardinal Health's hydrocodone threshold for Cardinal Health was set at 150,005 on January 29, 2010.  In January, Family Discount ordered approximately 2600 hydrocodone doses above their 150,005 threshold.  Cardinal Health deemed the overage "not unreasonable" and filled the order.  A suspicious order report does not appear to have been filed.  *Exh. 28.*  Simply put, Dave's willingness to onboard Family Discount in 2010 was not an outlier position.

Family Discount utilized McKesson as one of its distributors for a very brief period in 2010.  They quickly left McKesson and utilized Cardinal as well as other distributors until 2012.

In 2012, Family Discount transitioned to McKesson.  Family Discount submitted a questionnaire to McKesson on or about August 24, 2012.  In their questionnaire, Family Discount disclosed that Cardinal Health restricted hydrocodone purchases based upon a "new Cardinal policy cap on Hydrocodone."

Before Family Discount became a McKesson customer, Dave conducted due diligence on Family Discount.  On September 6, 2012, Dave emailed a McKesson employee requesting that Family Discount's primary prescribing doctors be reviewed.  Dave further requested that Family Discount be vetted by the West Virginia Board of Pharmacy "to see if there is anything to be concerned about."  Dave stated that he was going to contact the manufacturers Mallinckrodt and Purdue "to see if they have any thoughts or history about this customer.  (They can see things we cannot)."  Finally, Dave stated that he was going to discuss Family Discount with his boss, Don Walker, to "allow him to weigh in."  *Exh. 29.*

Jennifer Buist from Mallinckrodt responded to Dave's inquiry that Family Discount had not "hit our radar as far as high volumes.  I don't have any other info on them."  *Exh. 30.*  Jack Crowley from Purdue Pharma replied to Dave's inquiry that he did not have any specific negative information about Family Discount.  He advised that another distributor (Cardinal) stopped doing business with them possibly because of the high volume of hydrocodone.  Mr. Crowley said, "I have no derogatory information surrounding the above scenario."  *Exh. 31.*

Most importantly, Dave, along with Mr. Walker, received feedback from the West Virginia Board of Pharmacy.  West Virginia Board of Pharmacy investigator F.E. Wagoner

- 12 -

advised that Family Discount was a "reliable high volume account." *Exh. 32.* Subsequent to this feedback, McKesson made a decision to onboard Family Discount.

In 2013, McKesson changed its corporate policy and began systematically reporting every order above the threshold by every pharmacy nationwide. As part of this corporate overhaul, McKesson reduced thresholds across the board for independent pharmacies. Dave lowered Family Discounts thresholds substantially on or about November 1, 2013.

On December 16, 2013, Family Discount requested an increase in their hydrocodone threshold back to an amount representing approximately 2/3s of its original threshold. Paragraph 39 of the PSI is incorrect when it states that Dave received and approved this increase on December 23, 2013. The threshold increase request form was submitted on December 16, 2013. Importantly, the threshold increase request form submitted by a McKesson employee stated, "After extensive research of their dispensing practices and understanding of their patient base they need to have access to purchase the above amount of doses in order to take care of their patient base. The PIC [pharmacist in charge] **recently had to turn away a cancer patient due to not having access to the product.** [emphasis added]. The patient did get their prescription filled at our other business partner Rite Aid." *Exh. 33.* On December 23, 2013, Dave approved this threshold increase.

Prior to resigning from his position as a DRA on March 17, 2014, Dave conducted a site visit at Family Discount. During his site visit, Dave did not see out of state license plates in the parking lot. Nor, did Dave observe evidence of drug use or drug paraphernalia in the parking lot. He noted that there was a hospital and 15 physicians within 10 miles of Family Discount. Dave noted that Family Discount's processes and procedures appeared to be in order including

utilizing state databases to identify drug seeking patients.  Based upon these observations, Dave recommended that McKesson continue to supply Family Discount but recommended a yearly review.  *Exh. 34.*

At this time in late 2013 and into 2014, McKesson was engaged in discussions with DEA that ultimately led to its 2017 settlement.  In response to their meetings with DEA, McKesson hired former DEA Diversion Investigators as DRAs to assist with compliance.  Scott Kurtz, a former DEA Diversion Investigator, was hired as one of several people to fulfill Dave's job responsibilities.  Mr. Kurtz visited Family Discount on March 27, 2014 in response to Family Discount's request to increase their Alprazolam threshold.  Mr. Kurtz, a former law enforcement officer, spoke to Lieutenant Brown at the Logan County, West Virginia Sheriff's Office.  This was a step that Dave had not taken.  Lieutenant Brown was unfamiliar with any problematic pharmacies but he did identify two doctors who he deemed "problem children."  Family Discount was filling prescriptions for these two doctors.  Mr. Kurtz elected to recommend terminating Family Discount.

DEA investigated Family Discount's dispensing of controlled substances, yet took no action.  Pursuant to a search warrant affidavit dated July 16, 2018 and tendered by the Government in discovery, DEA visited Family Discount in January 2013 based upon a database record check in reference to pharmacies in West Virginia ordering large amounts of controlled substances.  On November 4, 2013, DEA served an Administrative Inspection Warrant on Family Discount.  DEA did not take action against Family Discount.  Family Discount did not notify Dave of their interactions with DEA.  DEA did not advise McKesson to terminate Family Discount as a customer.  After McKesson terminated Family Discount in April 2014, Family

Discount began purchasing a similar amount of controlled substances from Miami-Luken. To the undersigned's knowledge, neither the DEA nor the West Virginia Board of Pharmacy has ever taken action to suspend or revoke Family Discount's ability to purchase controlled substances.

II.   Suspicious Order Reporting

DEA regulations require registrants to design and operate a system to disclose to the registrant suspicious orders of controlled substances. 21 C.F.R. § 1301.74(b). A suspicious order is defined by 21 C.F.R. § 1301.74 as "orders of unusual size, orders deviating substantially from a normal pattern, and orders of unusual frequency." Over the years, DEA has offered little concrete guidance to distributors on how they should comply with the suspicious order regulation. As an example, for many years prior to 2008, McKesson and other distributors satisfied 21 C.F.R. § 1301.74 by sending DEA voluminous excessive purchase reports. As part of McKesson's negotiations regarding its 2008 settlement and development of its CSMP, DEA advised that these excessive purchase reports were not useful and asked McKesson to no longer submit them. In response, McKesson developed a program that focused on reporting suspicious customers rather than individual orders.

As part of a 2008 settlement with DEA, McKesson developed the CSMP with a three level review process for pharmacy customers. The CSMP stated, "If after the Level 1 and Level 2 reviews have been conducted and the transaction(s) are deemed 'suspicious', a Level 3 review is necessary." Upon escalation to a Level 3, McKesson stopped all controlled substances shipments to the pharmacy in question and reported the pharmacy to DEA. *Exh. 1.* As part of the 2008 settlement, McKesson briefed DEA regarding their CSMP including reporting

- 15 -

suspicious customers to DEA.

DEA has offered informal and non-specific guidance to registrant's through letters issued in 2006 and 2007, and through individual enforcement actions, but neither the Controlled Substances Act ("CSA") nor the suspicious order regulation has been changed to formally reflect DEA's views on how registrants should comply with the law.  Kyle Wright, former DEA unit chief, has testified that DEA did not provide guidance to registrants, such as McKesson, regarding whether its anti-diversion and suspicious order reporting systems complied with the CSA and DEA regulations.  *Exh. 35.*  Joseph Rannazzisi, head of DEA's Office of Diversion Control, has testified that it was DEA's policy not to approve any distributor's suspicious order monitoring program.  *Exh. 36.*  DEA refused to provide guidance to distributors regarding what exactly constituted a suspicious order that should be reported to DEA.  DEA considered that a business decision each registrant would have to undertake for itself.  *Exh. 37.*  In fact, neither DEA nor the Federal Regulations require a particular method to flag suspicious orders.

Very recently, in September 2019, The Office of the Inspector General, after having reviewed the history of DEA's interactions with its registrants, produced a report recommending that "DEA should establish regulations, policies, and procedures that specifically define what constitutes a suspicious order, as well as what information should be included in a suspicious order report."[4] *Exh. 38.*  The Government Accounting Office likewise found that DEA should develop additional guidance for distributors for suspicious order monitoring and reporting.  *Exh.*

---

[4]  Office of Inspector General, *Review of the Drug Enforcement Administration's Regulatory and Enforcement Efforts to Control Diversion of Opioids,* (September 2019) at pg. 32.

*39.* DEA's former acting Administrator Chuck Rosenberg testified regarding DEA's lack of guidance concerning suspicious order reporting stating: "And we've been opaque. I think we've been slow. I think we've been opaque. I think we haven't responded to them [distributors]. We're trying to issue guidelines for them more quickly. We're trying to answer their questions."[5] Unfortunately, DEA's refusal to provide clear guidance as to how registrants should comply with the suspicious order regulation left registrants with questions unanswered as to what DEA considered compliance with 21 C.F.R. § 1301.74.

The Government's investigation was not harmed by Dave's failure to file suspicious order reports. First, DEA does not typically use suspicious order reports to investigate pharmacies. Mr. Wright further testified that DEA has no obligation to investigate a suspicious order report. *Exh. 40.* The Congressional Opioid Report found that it was unclear what action, if any, DEA took in response to suspicious order reports.[6] *Exh. 41.*

Second, regardless of whether Dave filed a suspicious order report, the Government was aware of all of McKesson's distributions of oxycodone and hydrocodone to Community Drug. McKesson submitted, as required by law, a monthly report of all sales of Schedule II drugs and Schedule III narcotic drugs to DEA through the ARCOS system to pharmacies like Community Drug. *Exh. 42.* DEA has the capacity to generate reports from the ARCOS data showing the number of dosage units distributed to a single pharmacy and compare that to purchases by other

---

[5] Testimony of Chuck Rosenberg, Senate Judiciary Committee Hearing on DEA Oversight (June 22, 2016), *available at* https://plus.cq.com/doc/congressionaltranscripts-4916672?0.

[6] Had the original indictment proceeded to trial, Dave was prepared to call Brian Rucker as an expert witness. Mr. Rucker is a retired DEA Diversion Group Supervisor. Mr. Rucker also retired as a Commander from the United States Naval Reserves. Mr. Rucker was prepared to testify that DEA rarely relied on suspicious order reports during Dave's tenure as a McKesson DRA.

pharmacies such as in the same county, the state or throughout the country. *Exh. 43.* DEA's

ARCOS team had the ability to examine ARCOS data and send it out to the field as investigative

leads. *Exh. 44.* Simply put, failure to file suspicious order reports did not prevent DEA from

obtaining potentially relevant pharmacy ordering information. *Exh. 45.*

In fact, DEA was aware of potential problems with Community Drug Pharmacy and were

actively investigating Community Drug was early as January 2012. On January 25, 2012, a

wiretap was initiated which captured incriminating conversations with Community Drug. *Exh.*

*46.* DEA's investigation included surveillance of Community Drug, cooperation with the

Kentucky Board of Pharmacy and multiple sources of information. A suspicious order report

was unnecessary to alert to DEA to potential problems at Community Drug. DEA's investigation

spanned at least 9 months culminating in the September 2012 search warrant. DEA did not seek

an administrative action to suspend or terminate Community Drug's ability to dispense

controlled substances while the investigation was ongoing. DEA did not advise McKesson or

Dave to cease sales to Community Drug. Likewise, DEA did not object to McKesson's decision

to reinstate Community Drug's ability to purchase controlled substances after the pharmacy was

terminated in May 2012.

Mr. Rannazzisi candidly testified that DEA delayed filing administrative actions to stop

suspect pharmacies from dispensing controlled substances to permit the completion of related

criminal investigations. *Exh. 47.* Further, DEA refused to advise distributors that they should

stop sales to a customer because of due process concerns and, thereby, unnecessarily left

compliance personnel at risk of legal jeopardy. *Exh. 48.*

Unlike many current McKesson compliance personnel, Dave did not have a background

in law enforcement or regulatory compliance.  He was selected because of his integrity but he received little formal training.  In a 2013 meeting with DEA, he described himself as "self taught."  He operated under the assumption that McKesson's policy to report suspicious customers not suspicious orders complied with 21 C.F.R. § 1301.74.  In fact, Dave asked DEA in July 2011 what constituted a suspicious order.

In retrospect, Dave should have reported a suspicious order in connection with Community Drug and his failure to do so is why he entered a plea to the misdemeanor offense charged in the Information.  However, reporting a suspicious order prior to terminating Community Drug as a customer was contrary to McKesson's policy and how he was trained.  Moreover, DEA was acutely aware of Community Drug's malfeasance while Dave was duped by Community Drug's assurances that they were dedicated to preventing diversion.

III.    Conclusion

Dave accepted the DRA position based upon the needs of his company.  He was selected for his integrity but, unfortunately, not based upon his compliance experience.  He attempted to faithfully implement McKesson's CSMP.  Dave understood his duty to be to report suspicious customers following a Level 3 review with his supervisor.  Following his meeting with DEA agents in July 2011, Dave should have done more to question McKesson's understanding of their duty to report suspicious orders.

However, subsequent Congressional oversight has also unequivocally faulted DEA for lack of transparency and effective communication with distributors about what was expected.  Moreover, McKesson changed their policy in 2013 and since that time reports all orders in excess of a threshold as suspicious.  Importantly and prior to the filing of this Information and the

- 19 -

preceding Indictment, McKesson paid $150,000,000.00 to the United States for failing to report suspicious orders throughout the United States.   Simply put, Dave was not a rogue employee who failed to comply with a regulatory requirement for personal gain.

Dave left his DRA position in early 2014.  In his March 17, 2014 resignation letter Dave wrote, "Trying to keep up with the new and cumbersome demands of this position is taking its toll on my health and well being." *Exh. 49.*  Dave's territory was very large and his position was extremely demanding.  Currently, McKesson employs several people to do the job that Dave did alone.  McKesson also now has several former DEA diversion investigators in their compliance department.  Dave had no law enforcement experience nor even a compliance background.

Additionally, Dave's failure to report suspicious orders by Community Drug did not keep the pharmacy's purchasing information hidden.  ARCOS data was provided to DEA as required and included information about the sale of oxycodone and other products.  Most importantly, Dave recommended terminating Community Drug as a customer in April 2012.  DEA was notified of the termination.  McKesson reinstated Community Drug in May 2012 based upon assurances and representations from Community Drug.  Again, DEA was notified.  DEA was aware of Community Drug's purchase history and, more importantly, their deception.  They did not share that information with McKesson.  Simply put, a suspicious order report prior to McKesson's termination of Community Drug or after the pharmacy was reinstated would not have had any impact on DEA's investigation.  As Dave's expert, Brian Rucker, would have testified at trial, DEA rarely, if ever, followed up on suspicious order reports.

Dave should have done a better job reporting Community Drug's suspicious orders prior to terminating them in May 2012.  But, he did not fail to act out of greed or ill motive.  The

- 20 -

nature and circumstances of the offense support a probated sentence.

      B.    <u>Personal History and Characteristics.</u>

        I.    <u>Lack of Criminal History.</u>

Dave has no criminal history.

        II.    <u>Family History.</u>

Dave is 69 years old and was born on August 5, 1951 in Greenville, Ohio. Dave has an older sister Dorothy and a younger sister Diane. His mother is still alive but suffering with dementia. Dave is very close to his family.

Dave met his wife Carol at Cincinnati Bible College in the fall of 1973. They got married in September 1974. Dave and Carol have been married for 45 years. Dave has three daughters and ten grandchildren. His daughter Kristen is a realtor with Keller Williams in Maineville, Ohio. She and her husband have three children. Dave's daughter Erin is a guidance counselor at a Christian school in Virginia. She and her husband have three children. Finally, his daughter Kara is a graphic designer and home schools her four children. Kara and her husband live in North Carolina.

Dave is a devoted husband, father and grandfather. His retirement life is centered completely around his family and his church. His family history strongly speaks to Dave's character and a life well lived.

        III.    <u>Work History.</u>

In the height of the Vietnam War, Dave voluntarily enlisted to serve in the United States

Marine Corp.  Dave was diagnosed with a congenital heart condition while serving as a United States Marine.  He received an honorable discharge.

Following his discharge, Dave completed high school and attended one semester at Cincinnati Bible College.  Subsequently, he worked as a manager in the food-services industry for approximately eight years and as a salesperson for Bostitch Tools for approximately three years.

As a devout Christian, Dave felt called to become a missionary.  From 1987 to 1994, Dave and his family served as missionaries with Christian Missionary Fellowship International.  They lived in Tanzania, Ethiopia, Kenya and Benin West Africa.  Among many roles, Dave worked as a logistician in connection with hunger relief efforts in Ethiopia during the famine.  Dave and his family had to leave Africa because of medical problems experienced by his wife Carol after she contracted malaria.

Following his return from his mission work in Africa, Dave joined McKesson in 1995 as an Inventory Control Supervisor and remained with McKesson for over 21 years through his retirement on April 15, 2016.  From 1995 to 2008, Dave's role focused on inventory management in McKesson's distribution centers, and he was recognized as Distribution Center Inventory Manager of the Year in 2002 after he organized McKesson's donation of $2 million in medical supplies to the Brother's Brother Foundation.

In 2008, McKesson recruited Dave to become a DRA in connection with the implementation of their CSMP.  Despite obtaining a position with substantially more responsibility, Dave's overall compensation did not increase.  Dave remained in his position as a

- 22 -

DRA until early 2014 when he resigned for health reasons.  The demands of his DRA position were exacerbating Dave's heart condition and causing him to develop other stress-related health problems.

From his resignation from his DRA position on March 17, 2014 to his retirement from McKesson in April 2016, Dave conducted audits of McKesson's distribution warehouses for compliance with the Food and Drug Administration, Department of Transportation, and other regulations related to drug storage and handling of hazardous material.

In April 2016, Dave retired from the workforce.  He spends his time with his wife, daughters and grandchildren.

IV.    Medical Condition.

Dave has "a history of paroxysmal atrial fibrillation status post pulmonary vein isolation ablation, hypertension, and congenital heart disease including bicuspid aortic valve with coarctation of aorta status post repair."  According to Dr. Mahmoud Houmsse, Associate Professor of Clinical Internal Medicine at the Ohio State University Wexner Medical Center, "stress will possibly aggravate his congenital aortopathy" and he should avoid stressful situations as much as possible.  *Exh. 50.*

Dr. Arsad Karcic, Assistant Professor in the Division of Cardiology at Ohio State University, writes, "He [Dave] is being treated for blood pressure, an irregular heartbeat known as atrial fibrillation, valvular heart disease and a weakened heart muscle known as nonischemic cardiomyopathy.  Patient is overweight.  The patient has numerous risk factors for developing a more severe form of COVID-19, and he is at increased risk of dying from it."  *Exh. 51.*

COVID-19 poses a substantial risk to vulnerable members of society.  According to the

CDC, "people of any age with the following conditions **are at increased risk** of severe illness

from COVID-19: … serious heart conditions."  Moreover, people with hypertension **might be at**

**an increased risk** for severe illness from COVID-19.  Finally, Dave is nearly 70 years.  His age

places him at "higher risk" for severe illness.  Applying the CDC's risk factors, Dave is

unquestionably at a high risk for severe illness should he contract COVID-19.

Jail and prison populations are particularly vulnerable to the contagious spread of

COVID-19 because of the close proximity.  According to the Bureau of Prisons ("BOP"), there

has been a "surge in positive cases at select sites."   BOP advises that 112 federal inmates have

died from COVID-19.  Should the Court sentence Dave to any incarceration, he would be at a

substantial risk not only to contract COVID-19 but to endure a severe reaction.  We respectfully

submit that Dave's misdemeanor crime does not warrant incarceration under any circumstances

but certainly do not warrant a life threatening risk during a global pandemic.

V.     Charitable Work.

Dave regularly attends and serves in his church, Amazing Grace Christian Church.  He

has served at various times as a worship leader, youth director, Sunday-school teacher, elder and

deacon.  Pastor Chris Solwecki writes, "Dave personifies humility, kindness and selflessness."

Pastor Solwecki notes that Dave has volunteered for numerous church events including taking

milk shakes to a 90+ year old Korean War veteran.  Pastor Solwecki further states, "I implore

you to please show leniency in sentencing to Dave.  He reflects the character of Christ, serves his

church, loves his family …" *Exh. 52.*

Dave and Carol have also been active in the Big Brother/Big Sister organization for ten

(10) years.  Dave has mentored JC for ten (10) years.  JC's father was in prison when Dave

became his Big Brother.  Dave has become the father that he has never had.  JC describes Dave as a "father figure" and a "role model."  JC also writes, "Whenever I'm with Dave he always makes me feel great and safe.  Dave is truly a great man."  *Exh. 53.*

Karen McDonald Myers, former executive director of South Central Ohio Big Brothers Big Sisters, writes:

> "When I think of David Gustin, two things really come to mind - family and faith.  He dearly loves and supports his family and he has always had a strong faith in God.  His faith guided him throughout his life and he has always been a devoted servant.  He has strong morals and values and he is a man who leads by example. He is honest, trustworthy, dependable, supportive, caring, hard working and is a man of great character.  He would never willingly hurt anything or anyone.  He is one of the best people I know and I am certainly glad our paths crossed." *Exh. 54.*

Carol writes, "We've always worked together to open our home to whoever needed us, teens in trouble, exchange students, missionaries, family, whoever."  *Exh. 55.*  Dave's daughter Kristen writes:

> "He [Dave] treats family and friends and folks we've just met and strangers in need ALIKE … with more generosity and love than you will believe.  Growing up as a missionary kid in Africa I watched he and my mother sacrifice time, labor, personal gain … food from our pantry, clothes .. nothing held back, to help those around us in need." *Exh. 56.*

Further, Dave has organized and accompanied young people on service trips to an orphanage in Appalachia.  He has fielded a team in the Highland County "Relay for Life" to raise money for cancer research.  Incredibly, Dave and Carol have paid tuition for more than forty-five children to attend summer camp at the Mountain Mission School ("MMS"), a private residential school for at-risk children.  Christopher Slone, president of MMS, writes:

"Dave has contributed much to our work through various means throughout the years –through volunteer service, teaching, singing and through financial giving.  In his gentle and quiet way, Dave sees needs on our campus, and he meets them, out of love and compassion.  Mountain Mission is blessed to have thousands of partners giving of their time, talent and money.  But to me, Dave Gustin stands out." *Exh. 57.*

Dave served as board president in 2019 for Mae El Salvador.  Mae El Salvador mission is to assist the vulnerable impoverished youth of El Salvador by spreading "Christ's love, restoring hope to their lives, and disciplining them to become mature and responsible adults, leaders of healthy families, and authentic followers of Christ."  Brittany Hibbs, co-founder of Mae El Salvador, writes, "Over the years we have seen Dave's heart and passion for missions, generosity, and love for people."  *Exh. 58.*

Possibly Carol summed Dave up best when she described him as "having a servant's heart." *Exh. 55.*

VI.     Character Letters.

Attached to this sentencing memorandum, are countless character letters in support of Dave.  They describe his love of Christ, his devotion to family, his kindness and decency.  So many provide personal anecdotal stories demonstrating Dave's inherent goodness.

One of my personal favorites comes from Eryne Graves.  Ms. Graves lost her grandmother, mother and sister.  Moreover, she had suffered horrible abuse.  She met Dave and Carol through a church youth group.  They became very close.  Dave became the father figure in her life.  Dave taught her that a husband and father should be "honest, loving, faithful, kind and committed."  When Ms. Graves got married she asked Dave to walk her down the aisle.  Dave was in France preparing to go to Tanzania as a missionary.  He flew home to be the father Ms.

- 26 -

Graves never had and gave her away at her wedding. *Exh. 59.*

Jared Miller, Director of Student Development at Mountain Mission School and Dave's son in law, writes, "He [Dave] would rather help others than help himself. Society needs more men like Dave." *Exh. 60.*

Carrie Louer writes, "Upon meeting Dave, you soon discover his commitment to God, his wife and his family. His faith in God defines him." *Exh. 61.*

Kimberly Holbert, formerly employed at the South Central Ohio Big Brothers Big Sisters writes, "Dave not only told his Little Brother about being a good person, Dave demonstrated to his Little Brother what being an honest, loving and hard working person was. Dave gave of his time not only to his Little Brother, but to many others throughout his involvement with South Central Ohio Big Brothers Big Sisters." Ms. Holbert states, "He [Dave] is a generous, caring, faithful, loyal and just a great human being." *Exh. 62.*

Ryan Dame lived with Dave and Carol as an exchange student. Ryan writes, "Dave Gustin saved my life." He further states, "Dave showed me what it meant to be a father that was present and invested." "Dave (and Carol) also demonstrated to me what a true marriage looks like. One filled with love, partnership and respect." Ryan writes, "I hope one day others will say I have impacted their lives in such a substantial way that Dave has impacted mine." *Exh. 63.*

Pat Hickey has known Dave for 35 years. Regarding Dave's missionary work, Mr. Hickey writes, "Very few men would quit their jobs, raise support money and take their young children around the world to serve God and his fellow man in such a selfless way." *Exh. 64.* Debbie Hickey, Pat's wife, writes, "One example I recall that showed his [Dave's] leadership and integrity took place in Ethiopia. He stood in line for over 8 hours one day to be able to obtain

food for some villagers that had none." *Exh. 65.*

Jakwon's mother probably sums up Dave best.  She writes, "We can't ask for a better person … we love so much.  I wish everyone was like Mr. Gustin and we would have a better world." *Exh. 66.*

Additional character letters which were too numerous to summarize are attached as a collective exhibit.  *Exh. 67.*

       VII.    Conclusion.

Dave's personal history and characteristics advocate strongly, if not shout from the rooftops, in support of mercy and leniency.  He has dedicated his life to Christ, his family and the less fortunate.  While many of us profess to be Christians, so very few of us truly dedicate our lives to habitually trying to follow Christ's example.  Dave Gustin is one of those special few.

He has made the world a better place in so many ways.  His family attests to his character.  His church attests to his character.  His countless friends and those many he has selflessly helped over the years attest to his character.  Dave's personal history and characteristics strongly support a probated sentence.

       C.    Need for the Sentence Imposed.

           1.    Probation Reflects the Seriousness of the Offense.

Dave pled guilty to the misdemeanor offense of failing to report suspicious orders relating to Community Drug Pharmacy in 2011/2012.  Prior to the enactment of 21 U.S.C. § 832 in 2018, it is unlikely many, if any, were ever prosecuted for failing to report a suspicious order.  Dave pled guilty to an offense occurring eight years ago and prior to the Congress passing a statute

regarding suspicious order reporting.[7]

Dave followed McKesson's interpretation of his duties under 21 C.F.R. § 1301.74. Subsequently, McKesson paid the United States $150,000,000 for failing to properly report suspicious orders throughout the United States.[8] Dave was not a rogue employee double dealing against his employer's interests for his own gain. In retrospect, he recognizes that he should have reported Community Drug before he did. He made a mistake and has paid dearly for it. The past year and a half have been horrible for him and his family. Only his faith and family have gotten him through this ordeal. Sentencing Dave to probation reflects the seriousness of the offense, promotes respect for the law and provides just punishment.

### 2.   Probation Affords Adequate Deterrence to Criminal Conduct.

Criminal prosecution, conviction and a probated sentence certainly sends a strong message to compliance officers that they must investigate and strictly adhere to all federal regulations relating to their job. This prosecution is a siren call to compliance personnel that they cannot simply rely upon corporate interpretation of regulations or even a "this is how we have always done it" approach. The fact that Dave's offense conduct is eight (8) years old further strengthens a chilling and significant deterrent message.

Simply put, a sentence of probation affords adequate deterrence.

### 3.   Probation Protects the Public from Dave Gustin.

Dave is no longer a DRA. He voluntarily left his position in 2014 based upon the overwhelming workload and job stress affecting his health. Dave retired from McKesson in

---

[7] 21 C.F.R. § 1301.74 was in place in 2011/2012.
[8] The United States Attorney's Office for the Eastern District of Kentucky participated in the $150,000,000

2016.  He is completely retired from the workforce.  Obviously, he is not nor will he ever again be in a compliance position.  Dave has never previously had an interaction with the criminal justice system.  His life speaks to good character.  There is absolutely no reason to believe Dave will ever again commit a criminal offense or be unsuccessful on probation.

    4.    <u>Providing Medical Care in the Most Effective Manner.</u>

Dave is not in need of any educational or vocational training.  Nor, is Dave in need of any correctional treatment.  Given his age and his heart condition, he is now and will continue to be in need of effective medical care.  Without question, the quality of his medical care will suffer if he is incarcerated.  Moreover and as previously discussed, a sentence of incarceration would greatly increase his chance of contracting COVID-19 which could be very detrimental to Dave given his aforementioned risk factors.

    5.    <u>Conclusion.</u>

Dave stands convicted of a misdemeanor offense from 2011/2012.  He was charged long after he voluntarily left his DRA position and after he retired from McKesson.  He is no longer a compliance officer and never will be again.  The past 18 or so months have been a living nightmare for him and his family.  Undoubtedly, this prosecution has sent shock waves through many corporate compliance departments.  The message has been sent.

There is no need to impose a sentence of incarceration to accomplish the goals of sentencing Dave for this misdemeanor offense.

    D.    <u>Kinds of Sentences Available.</u>

Probation is authorized by both the statute of conviction and by the United States

---

settlement with McKesson.

Sentencing Guidelines ("U.S.S.G.").  Dave's total offense level remains to be determined by the Court but regardless of the Court's ruling concerning Dave's guideline objections, Dave's guideline range is 0-6 months.  Dave's range is in Zone A of the U.S.S.G. authorizing probation. As an aside, Dave's total offense level is the lowest offense level that I recall seeing in 17 years of practicing in United States District Courts.  Dave's total offense level and Zone A sentencing range support a probated sentence.

      E.      <u>Conclusion.</u>

Dave has lived an exemplary life.  A life to be emulated.  A life that has made a positive impact not only on his family but on his church, his friends, his little brother and literally in lives of starving children in Africa.  Just reading Dave's character letters made me question my own contributions and was a challenge to do more.  He is exceptional.

Dave made a mistake in not fulfilling his regulatory compliance duties sooner in connection with Community Drug Pharmacy.  But, he did not make this mistake out of greed, personal gain or malice.  Like all of us, in retrospect there are times we could have done a better job.  Dave and his family has suffered a traumatic ordeal the last year and a half.  He has endured it with faith and family.  He will accept whatever sentence is imposed with Faith and the support of his family.  But respectfully, probation is warranted in this case and we respectfully request that you sentence Dave to probation.

Respectfully submitted,


/S/ Brian Butler
Brian Butler
400 West Market Street, Suite 1800
Louisville, Kentucky 40202
(502) 594-1802



## CERTIFICATE OF SERVICE

It is hereby certified that a copy of the foregoing sentencing memorandum was electronically filed on October 8, 2020, with service to counsel of record.


/S/ Brian Butler
Brian Butler
Attorney at Law